COLTEC INDUSTRIES, INC., Plaintiff,

v.

AMERICAN MOTORISTS INSURANCE COMPANY and Zurich Insurance Company, Defendants.

Nos. 99 C 1087, 99C3192, 99C3929.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 30, 2000.

George Kazakis, Covington & Burling, Washington, DC, for plaintiff.

Thomas J. O'Brien, Meckler, Bulger & Tilson, Chicago, IL, for defendant.

## *MEMORANDUM ORDER*

BOBRICK, United States Magistrate Judge.

Before the court is the motion of plaintiff Coltec Industries, Inc. ("Coltec") to compel production of documents from defendant Zurich Insurance Company ("Zurich").

The instant case concerns Zurich's coverage obligations under insurance policies it issued Coltec between thirty-five and forty-one years ago. The parties have struggled with the instant discovery dispute to a degree that would not seem possible. It would appear that, at last count, 47 documents are presently at issue which Zurich has claimed are protected from discovery under either the attorney-client privilege or work product doctrine or both. Originally, Coltec sought production of 59 documents, which it named in three separate lists of 42, 36, and 31 documents each. In the meantime, Zurich produced a privilege log listing 67 documents. When the parties briefed this matter, they apparently felt that 43 documents were at issue but, even then, their respective lists failed to match that number. We note that, when the parties to a discovery dispute cannot agree on how many documents are at issue, it does not bode well for resolution of the dispute. We also note that, in a similar vein, the parties disagree over the number of documents Zurich has already produced.

On November 1, 2000, this court issued an order mandating the parties arrive at a final resolution as to which documents are in dispute and, finally, Zurich and Coltec seem to agree on 47 documents. Unfortunately, Zurich has produced yet another *version* of its privilege log, in which it has amended a large number of descriptions of documents that both the court and Coltec have been working with for several months. Obviously, Coltec has not had an opportunity to respond to this new log. Zurich's conduct is outside the scope of this court's order and at this late date and, months after the parties' dispute began, it is unacceptable. Accordingly, the court will not consider any amended descriptions in the privilege log.[1]

### I. *LEGAL STANDARDS*

■ Discovery disputes such as this one-involving insurance documentation-are familiar to this court. As such, we begin by revisiting the law applicable to these recurring matters, as outlined in *Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 145 F.R.D. 84 (N.D.Ill.1992).

The party seeking to invoke the protection of a privilege, or discovery opponent, has the burden of establishing all of its elements. In the case of the attorney-client privilege, the Seventh Circuit has adopted the elements as outlined by Wigmore:

(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client,

---

1. The Court will not consider any motions directed at rulings that result from its refusal to consider amended descriptions in the privilege log.

(6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

A claim of privilege cannot be a blanket claim, but must be made and established on a document-by-document basis. The scope of the privilege is narrow, because it is a "derogation of the search for truth." We stress that each of these elements must be established as to each document, as the mere existence of an attorney-client relationship is not sufficient to cloak all communications with the privilege.

The work product doctrine is distinct from, and broader than, the attorney-client privilege. The work product privilege developed to protect the work of an attorney from encroachment by opposing counsel. It consists of a multi-level protection whereby that information most closely related to an attorney's litigation strategy is absolutely immune from discovery, while that information with a more tenuous relationship to litigation strategy might be available in circumstances evincing a substantial need or undue hardship on the part of the discovery proponent.

The threshold determination in a case involving a claim of work product privilege is whether the material sought to be protected from discovery was prepared in anticipation of litigation. The determination of whether materials are prepared in anticipation of litigation, however, while central to the work product doctrine, eludes precision. This is especially the case in the insurance context, where insurers routinely perform investigations and accumulate files even when no litigation ensues. In this court's experience with such cases, the work product doctrine becomes an all-encompassing shroud of secrecy that is at once at odds with the federal rules' liberal discovery policy and the protection of attorney's thought processes and strategies the doctrine was designed to be. Rather than using the doctrine to immunize these strategies and opinions from discovery, some discovery opponents seem to use the doctrine to relieve themselves of the burden of producing factual information accumulated in what appears to be routine investigations. Accordingly, we have found it helpful to express the elements of the work product doctrine into the concepts of "causation" and "reasonable anticipation" of litigation.

As already noted, "work product" is defined as those materials produced because of the anticipation of litigation. Thus, there is a "causation" element insofar as production of the material must be caused by the anticipation of litigation. If materials are produced in the ordinary and regular course of a discovery opponent's business, and not to prepare for litigation, they are outside the scope of the work product doctrine. Accordingly, even if litigation is imminent, there is no work product immunity for documents prepared in the ordinary course of business rather than for litigation purposes. "Prudent parties anticipate litigation, and begin preparation prior to the time the suit is formally commenced. Thus, the test should be whether, in light of the nature of the document and the factual situation . . . the document can fairly be said to have been prepared or obtained because of the prospect of litigation." That is to say, the mere fact that a discovery opponent anticipates litigation does not qualify an "in-house" document as work product.

As for "anticipation of litigation," courts have made clear that, because litigation can be anticipated at the time almost any incident occurs, a substantial and significant threat of litigation is required before a discovery opponent's anticipation will be considered a reasonable and justifiable motivation for production of a document. Although a precise definition of this level of "threat" is elusive, it is perhaps best described as requiring a showing of "objective facts establishing an identifiable resolve to litigate." The fact that litigation actually ensues or that a party has retained an attorney, initiated investigations, or engaged in negotiations over a claim, is insufficient to dispositively establish anticipation of litigation.

Bearing in mind all these factors, it can be summarized that, in order to establish work production protection for a docu-

ment, a discovery opponent must show that "the primary motivating purpose behind the creation of a document ... must be to aid in possible future litigation," under circumstance where the discovery opponent can show "objective facts establishing an identifiable resolve to litigate." Only by strictly construing the elements of work product, can the doctrine's original intent be best served. That intent is to protect the adversarial process by providing an environment of privacy in which a litigator may creatively develop strategies, legal theories, and mental impressions outside the ordinary liberal realm of federal discovery provisions, thereby insuring that the litigator's opponent is unable to ride on the litigator's wits. To apply the doctrine to those materials that insurers, or other parties, would produce in the ordinary course of business even if litigation were not imminent is an unwarranted extension of the doctrine. Therefore, we caution insurers ... against asserting the doctrine to preclude from discovery materials that, given the minimal information presently available to this court, appear to have been produced in connection with the routine investigation and evaluation of an insurance claim.

*Allendale*, 145 F.R.D. at 86–87 (citations omitted). In this dispute, Zurich has provided a privilege log, and a supporting memorandum of law, in order to substantiate its claims of attorney-client privilege and work product doctrine under the forgoing analysis.

Beyond work product and attorney-client privilege, Zurich also lodges several objections based on admissibility and relevance. Zurich argues, first, that Coltec is not entitled to documents bearing on settlement strategies, citing Fed.R.Evid. 408. That rule makes inadmissable:

> [e]vidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim ... is not admissible to prove liability for or invalidity of the claim or its amount... Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

> This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations...

Fed.R.Evid. 408. At the same time, we note that Fed.R.Civ.P. 26(b)(1) provides that the discovery "sought need not be admissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

Zurich also argues that documents bearing on insurance reserves are irrelevant; Coltec submits it is relevant in cases involving a "lost policy" defense. Generally, courts have refused to order production of such material. *Leksi, Inc. v. Federal Insurance Co.*, 129 F.R.D. 99, 106 (D.N.J.1989); *Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.*, 117 F.R.D. 283, 286 (D.D.C.1986). In *Leksi*, the court specifically found reserve information "only tenuously relevant" to a "lost policy" defense. 129 F.R.D. at 106. To the extent discovery has been allowed over relevancy objections in this area, it has not been in the form of document production, *Stonewall Ins. Co. v. National Gypsum Co.*, 1988 WL 96159, *6–7 (S.D.N.Y. Sept. 6, 1988) (deposition), or has been relevant to another issue. *Savoy v. Richard A. Carrier Trucking, Inc.*, 176 F.R.D. 10, 12 (D.Mass. 1997)(bad faith); *Fridkin v. Minnesota Mutual Life Ins. Co., Inc.*, 1998 WL 42322, *2 (N.D.Ill. Jan. 29, 1998)(bad faith). Accordingly, Zurich's arguments appear to be well-taken on this issue.

## II. *BACKGROUND OF DISPUTE*

Resolution of much of this dispute turns on the manner in which this case evolved, and the parties have provided some background information regarding their road to litigation. In 1991, Coltec submitted claims for environmental coverage at 12 sites under the policies, which Zurich denied. In 1993, another Coltec insurer, Aetna Casualty & Surety Co., filed suit in New York state court against Coltec and 33 insurance companies, including Zurich American Insurance Company. This suit concerned insurance coverage for environmental clean-up of 52 sites in 18 states. Coltec successfully moved to dismiss all non-New York sites from that action in February

of 1994, and then filed its own declaratory judgment actions in seven states. Perhaps not surprisingly, the parties disagree as to whether Zurich was named in any of these suits; it would appear, however, that either Zurich International or Zurich American, as opposed to Zurich, were named defendants. (*Zurich Insurance Company's Response* ("*Response*"), at 3; *Reply Memorandum in Support of Plaintiff Coltec's Second Motion* ("*Reply*"), at 3). Notably, to support its work product claims, Zurich characterizes this as a "palpable" and "constant threat" of litigation with Coltec since February of 1994. (*Response*, at 3).

Coltec points out that, in 1997, it entered into an agreement with its various insurers which prohibited parties from initiating coverage litigation. It claims that Zurich's coverage counsel signed the agreement on behalf of Zurich and its affiliates. According to Coltec, this means Zurich could not have been "anticipating litigation" during this period, thereby undermining its claims of work product for documents produced during that time. The document before the court includes a signature page signed on behalf of Zurich International only. (*Reply*, Ex. B). The signatory firm of Bates Meckler Bulger & Tilson Zurich, however, does appear to represent Zurich as well. Coltec goes on to state that Zurich "secretly filed suit against Coltec" in November of 1998 and did not serve Coltec until three-and-a-half months later. (*Reply*, at 3). As noted previously, Zurich considered a suit against Zurich International to be a suit against it, so perhaps it considers the signatory page binding as well. We have no way to tell, as the parties have not addressed the relationship among the various "Zurich" companies. Even if such a document were binding on Zurich, we are unconvinced that it would automatically prohibit work product claims for materials prepared at that time.

Finally, in response to Zurich's suit, Coltec filed its declaratory judgment action. Zurich notes the Coltec was able to file the day after it learned of the Zurich action which, according to Zurich, demonstrates Coltec had been in a litigation mode all along. Zurich's main defense is that Coltec cannot establish the terms of the policies at issue as they are missing. Coltec claims the discovery at issue here is designed to shed light on the terms of those standard policies.

### III. ANALYSIS OF PRIVILEGE LOG

■ To resolve the instant discovery dispute, we rely on the privilege log provided by the discovery opponent, Zurich. In *Allendale*, this court determined that a privilege log should list each document sought to be protected and should provide details describing the documents. 145 F.R.D. at 88. The *Allendale* ruling essentially fleshed out the applicable Federal Rule of Civil Procedure, that addresses the manner in which privilege claims must be made as follows:

> the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable the other parties to assess the applicability of the privilege or protection.

Fed.R.Civ.P. 26(b)(5). Given the elements required to support a claim of work product or attorney-client privilege, each document in a privilege log should contain details including: date, author and all recipients of the document, subject matter, purpose, and an explanation as to why the document should be privileged and not produced in discovery. 145 F.R.D. at 88. It may be overstating the obvious, but in this court's experience it is necessary; describing a document as "legal advice" or "work product" is not the same as *establishing* that the documents are immune from discovery. As we review Zurich's log in the instant matter, we observe many such descriptions, which, are insufficient to carry Zurich's burden of establishing attorney-client privilege or work product. For example, this is a case about coverage for insurance claims; clearly, describing a document as "claim summary" will do nothing to distinguish it from perhaps thousands of others. With these principles in mind, we assess the showing Zurich has made in support of its discovery opposition.

■ Four documents are described as "Evaluation of site costs and Coltec's claimed

damages" and were authored and reviewed by "Account Specialists."[2] Zurich submits these are work product and therefore, beyond discovery. These were created in April, September, and October of 1998, shortly before Zurich "secretly" filed suit in November of 1998, which in terms of timing, would lend credence to Zurich's claims that they were prepared in anticipation of litigation. On the other hand, evaluations of costs and claims—here we assume the unexplained phrase "claimed damages" refers to *insurance* claims, as Coltec had not filed suit against Zurich at that time—performed by account specialists, are the types of tasks insurance companies perform in the ordinary course of business, whether or not litigation was imminent. There is no reference to attorney participation or legal analysis. (For the first time, in its log dated November 8, 2000, Zurich asserts that these documents are based on analyses provided by legal counsel. As noted above, the court is disregarding such additional matter provided outside the scope of our order of November 1, 2000.) Accordingly, we cannot find that Zurich has met its burden of establishing these documents constitute work product. Zurich must produce documents ZUR 002689–002693, 002700–002702, 002703–002713, 002812–002813.

■ Two documents are described as dealing with "Coltec Declaratory Judgment Action, including legal advice from Bates Meckler Bulger & Tilson ("Meckler") and an evaluation of Coltec settlement demand."[3] These were authored by "Account Specialists" and sent to the vice president of environmental claims. Two others—same authors and recipients—deal with settlement analysis and analysis of the law governing coverage issues as provided by Bates.[4] Zurich claims these are protected by both attorney-client privilege and work product doctrine. Although at the time these documents were prepared, Coltec had not yet filed its declaratory judgment action against Zurich, the descriptions are sufficient to suggest Zurich could have sought legal advice in view of the suit against the other insurance companies, thereby cloaking the documents with the attorney-client privilege. Accordingly, Zurich need not produce these materials.

■ One document is described as "Settlement/reserve evaluation Based on legal advice provided by Bates concerning legal defenses to Coltec claims" and is authored by an "account specialist" in July, 1996. Zurich claims this is protected by the attorney-client privilege and work product doctrine.[5] Litigation was not pending against Zurich at that time, but it is conceivable that Zurich was assessing its options in view of Coltec's declaratory judgment action, perhaps to gird its denial of Coltec's coverage claims. As this document appears to reveal legal advice, we find it protected by the attorney-client privilege.

■ Zurich seeks to withhold eight documents, described simply as "Site summaries" or "Claim summary" under the attorney-client privilege and/or work product doctrine.[6] These descriptions are too vague to determine if the materials qualify as legal advice or work product. In addition, none of these documents list an author, making it a matter of speculation as to whether they were authored by individuals that could be expected to be involved in preparation for litigation, or whether there was any degree of attorney involvement that might suggest they contain legal advice. Accordingly, Zurich has failed to meet its burden with regard to these documents and must produce these materials: ZUR 004248, 004331, 004916, 005037, 005086, 005196, 005976.

■ Zurich seeks protection for another document, and seven duplicates thereof, described as "Site and cost summaries, pre-

---

**2.** Documents ZUR 002689–002693, 002700–002702, 002703–002713, 002812–002813.

**3.** Documents ZUR 004134–004146, 004147–004182.

**4.** Documents ZUR 004183–004209, 004210–004214.

**5.** Document ZUR 004221.

**6.** Documents ZUR 004248, 004331, 004916, 005037, 005086, 005196, 005447, 005976.

pared by outside counsel Meckler in connection with *Coltec Ind. v. Aetna* ...provided to Zurich as part of legal advice concerning litigation and settlement strategy."[7] These documents were prepared by counsel in November of 1995 in connection with the Coltec declaratory judgment action against Aetna and others, which did not involve Zurich. According to Zurich, they constitute either work product, attorney-client privilege, or both. As with other similar documents, however, we can accept that the Coltec litigation may have prompted Zurich to assess its legal options. We find these documents protected by the attorney-client privilege.

 Others are less specifically described as "Settlement/reserve evaluation" or, even more cryptically, "Reserves."[8] These are also authored by "account specialists." (For the first time, in its log dated November 8, 2000, Zurich asserts that these documents are based on analyses provided by legal counsel. As noted above, the court is disregarding such additional matter provided outside the scope of our order of November 1, 2000.) The brief, unadorned description does not allow the court to determine whether the evaluations were of the type performed in the regular course of business, or as part of a litigation strategy. Accordingly, we cannot find they are protected by work product. Nevertheless, because these appear to be documents bearing on insurance reserves, we find, given the case law, that they need not be produced in this matter.

 According to the privilege log, a set of eight documents consist of settlement and reserve evaluations based on Meckler's legal advice on defenses to Coltec's claim.[9] Unlike the previous group of documents, these are described in a manner that at least suggests they may reveal confidential legal advice.

Accordingly, we find they are protected from discovery under the attorney-client privilege.

Zurich also seeks work product protection for three documents relating to analyses of coverage issue in connection with Coltec's settlement demands.[10] Two documents, 004894–004895 and 005441–005442, are described as bearing on legal issues, although prepared by an "account specialist." The other, 005186–005187, was originally said to deal merely with coverage issues, which would be a part of the regular course of business for an insurance company. (Again, however, for the first time before this court, Zurich now claims this document reveals legal advice or analysis from outside counsel.) As originally described, these documents were prepared by "account specialists," and there was no suggestion that they included input from attorneys. Accordingly, while we accept Zurich's proposition that 004894–004895 should be shielded from discovery, Zurich must produce 005186–005187.

 The privilege log also lists two documents dated March 20, 1990, from attorney Matthew Gehringer, one on the topic of lost policies and legal advice concerning pending litigation, and the other, on "Lost policies."[11] Zurich claims these documents are protected by both attorney-client privilege and work product. (Zurich also has supplemented its description in its November 8 privilege log.) We can summarily dismiss Zurich's work product claim as, according to Zurich's response memorandum, "the origins of this case date back to 1991." As the letters were authored by an attorney, however, we will accept Zurich's claim that they deal with legal advice and are protected by the attorney-client privilege.

 Zurich describes one other document from the privilege log as, briefly, "Claim information and evaluation of exposure."[12] (These descriptions, too, were sup-

---

7. Documents ZUR 004234–004244, 004923–004933, 004343–004353, 005044–005054, 005094–005104, 005212–005222, 005471–005482, 005984, 005985–005996.

8. Documents ZUR 004291, 004305, 004896, 004897, 004899, 005303, 005443–005446, 005984006128, 006196.

9. Documents ZUR 004318, 004994, 005021–005022, 005087, 005223, 005960, 006116, 006137–006138.

10. Documents ZUR 004894–004895, 005186–005187, 005441–005442.

11. Documents ZUR 006367–006369, 6721–6757.

12. Document ZUR 005448.

plemented in the November 8 version of the privilege log.) Authored by an "account specialist," this document is dated July 10, 1996. Although Zurich claims this work product, insurance companies would evaluate claims and exposure in the ordinary course of business. Based on the privilege log, we must find that this document, ZUR 005448, is discoverable.

 The privilege log lists a set of seven documents, six of them duplicates, as "Notes from meeting with Coltec and Zurich's legal counsel" authored by an "account specialist" on October 11, 1996.[13] Zurich argues that these are protected by the attorney-client privilege and work product, insofar as they are "Zurich's evaluation of Coltec's claims based on analysis performed by outside legal counsel." As the description suggests that legal advice or analysis might be revealed, we find these documents to be privileged and protected from discovery.

Zurich describes document ZUR 005523 as, simply, "Reinsurance." According to Zurich, this document constitutes work product and is "outside the scope of the court's May 26, 2000 Order..." Obviously, Zurich's conclusory, one-word description is far too cryptic to allow the court to assess either of these claims. Zurich must therefore produce this document.

 Finally, the privilege log lists three documents, presumably two of which are duplicates although the log does not indicate, as "Policy search, analysis and legal advice provided by outside counsel ..." The document was authored by a Zurich paralegal on November 11, 1997, and sent to an "account specialist." As the description suggests these documents may reveal legal advice, we find they are protected by the attorney-client privilege.

## IV. *CONCLUSION*

For the foregoing reasons, the plaintiff's motion to compel is GRANTED in part and DENIED in part. Zurich is ordered to produce within five days those documents found subject to discovery, as described in this Order.

---

13. Documents ZUR 004337–004342, 004917–004922, 005038–005043, 005088–005093, 005206–005211, 05483–05490, 005977–005983.